JOHN W. BARRETT

*vs.*

THE LEWISTON, BRUNSWICK & BATH STREET RAILWAY CO.

Sagadahoc.    Opinion December 20, 1912.

*Accident. Contract. Damage. Exceptions. Fraud. False Representations. Intent. Mental Capacity. Material Fact. Release. Settlement.*

1. If one party to a contract, with intent to deceive, conceals or suppresses from the other a material fact which he is bound in good faith to disclose, it is tantamount to a false representation.
2. If one party conceals any fact material to the transaction, and peculiarly or exclusively within his knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if it were expressly denied.

3. The suppression to be fraudulent must relate to a material fact, known to one party and which it is his legal duty to communicate to the other. That duty may arise from a relation of trust, from confidence, or from inequality of condition or knowledge.

4. Concealment implies design and purpose. Mere silence is not of itself concealment. Whatever the purpose, if the party is not misled, no relief can be had for fraud.

5. The plaintiff in this case seeks to have a settlement made by him with the defendant, for damages occasioned by the defendant's negligence, regarded as null and void, on the ground that the settlement was induced and procured by a fraudulent suppression on the part of the defendant of the truth respecting the probability of the plaintiff's having to suffer the amputation of a leg. It is *held,* that a finding that the defendant was guilty of a fraudulent suppression of the truth, or that the plaintiff was misled by the defendant's conduct or silence could only be based upon inferences not warranted by the evidence.

On motion by defendant. Sustained.

This is an action on the case to recover for personal injuries to the plaintiff alleged to have been occasioned by the negligence of the defendant. The plaintiff was a passenger on one of the defendant's electric cars, on the eleventh day of October, 1906, going from Topsham Fair Grounds to Brunswick, and that during said passage, the car on which he was a passenger ran off the track, through the negligence of the defendant, and that he then and there received the injuries complained of. The case has been tried twice before, each trial resulting in a verdict for the plaintiff. On October 27, 1906, the defendant's superintendent paid the plaintiff, on account of the defendant company, five hundred dollars and agreed to pay in addition thereto all his hospital and surgical expenses, and the plaintiff in turn, in writing, released the defendant from all claims and demands. The plaintiff seeks to avoid this settlement on the ground that it was fraudulently obtained and not binding. Plea, the general issue. The jury returned a verdict for the plaintiff for $2912, and the defendant filed a general motion for a new trial.

The case is stated in the opinion.

*Oakes, Pulsifer & Ludden,* for plaintiff.

*Newell & Skelton,* for defendant.

SITTING: WHITEHOUSE, C. J., SAVAGE, CORNISH, KING, HALEY, JJ.

SAVAGE, J.    Case for negligence.    The plaintiff was a passenger on one of the defendant's cars, and was injured in some way.    The manner is not described in the case, for the defendant admitted at the trial that it was originally liable.    The plaintiff sustained a compound, comminuted fracture of the bones of the right leg, near the ankle.    The accident occurred in Topsham, October 11, 1906.    The plaintiff was taken at first to the office of Dr. Palmer, in Brunswick, and from there to St. Mary's hospital in Lewiston, Dr. Palmer accompanying him.    On November 21, 1906, his leg was amputated below the knee, and later it became necessary to amputate it above the knee.    He remained in the hospital one hundred and forty-one days.    On October 27, sixteen days after the accident, the defendant's superintendent paid him, on account of the company, $500, and agreed to pay all his hospital and surgical expenses, and the plaintiff in turn, by a general release, released the defendant from all claims and demands.    The defendant relies upon that settlement as a complete defense.    To this the plaintiff replies that the settlement was fraudulently obtained and not binding.    The case has been tried twice before, each trial resulting in a verdict for the plaintiff.    At those trials the question of fraud was eliminated by the court, and the only question submitted to the jury was the mental competency of the plaintiff to make the settlement, at the time he made it.    Those verdicts were set aside, one after the other, by the Law Court.    It appeared clearly to the court that the plaintiff was mentally competent to make the settlement, that he well understood at the time what he was doing, and fully appreciated the effect of the settlement.

At the third trial, the presiding Justice was of opinion that the evidence on the question of competency was no more favorable to the plaintiff that it had been at the other trials, and instructed the jury, in effect, that they would not be authorized to find a verdict for the plaintiff on the ground that he was mentally incompetent to make the settlement; but that if they found certain facts to be true, they would be authorized to find that the settlement was fraudulently procured.    And the jury so found.    The case comes

up on the defendant's exceptions to the instructions of the presiding Justice on the question of fraud, and on a motion for a new trial.

To understand the instructions, and the contentions of the plaintiff, it is necessary to state other facts. Two or three days after the accident Dr. Palmer was employed by Mr. Farr, the defendant's superintendent, to visit the plaintiff at the Lewiston hospital. He was directed, so he says, to "see that everything is done to save that man's leg." He says Farr told him to look out for him until he got out. He visited him at intervals generally of three or four days as long as he stayed in the hospital, and particularly, as relates to this case, October 14th, 18th, 22nd and 26th. The plaintiff did not know that Dr. Palmer was employed by the defendant; he had not himself employed him. It does not appear that he gave the matter any thought. The plaintiff testified that Dr. Palmer at one time told him that he thought the leg would be saved, but he was unable to fix the time the statement was made. Binette, a hospital nurse, testified that Dr. Palmer told the plaintiff every time that he was going to save his leg. Dr. Palmer testified that he never told the plaintiff that he would save his leg, but he says he had some hope of saving it. But on cross-examination he said that at one of the first two or three visits he might have told him that "he hoped to save the leg." He also said that he reminded him that Dr. Russell, the surgeon in charge of the hospital, told him at the start that he "thought the leg would have to come off." He further testified that on October 26, the last time he saw him before the settlement, he thought there was "some chance of saving the leg," and that he talked with him that day about the leg, and the plaintiff said, in connection with some talk about a settlement, that he was "going to have the money and keep the leg." Binette testified that the plaintiff asked him several times if the leg could be saved, and that he told him "no." Dr. Russell testified that he advised amputation at the first, and that although he talked with him about it, he never gave the plaintiff any encouragement that the leg could be saved. It appears that the plaintiff and Farr agreed upon the terms of settlement in a room in the hospital to which the plaintiff had been removed for that purpose, and that no one else was present, but nothing was said by either as to the prospects of sav-

ing the leg. But before the release was executed, Dr. Russell was called in by Farr, and the terms of settlement were stated to him. Dr. Russell testified that he read the release to the plaintiff, and explained to him that he would not get any more money, even if the leg had to be amputated. This is all the testimony that bears on the probabilities, on October 27th, of saving the leg, or on the plaintiff's expectations.

Upon the evidence in the case, we think the jury would have been warranted in finding that Farr's purpose in employing Dr. Palmer was not alone to secure his professional services in the treatment of the case, but that he might be of some assistance either in making a settlement, or failing that, in litigation which might ensue on the question of damages, which in itself was not an unlawful purpose. It does not appear, and should not be inferred that Dr. Palmer was asked to say anything to the plaintiff about a settlement. Nor does the case warrant the inference that, if Dr. Palmer encouraged the plaintiff to think that the leg could or might be saved, he did so for the fraudulent purpose of inducing him to settle for a less sum than he would otherwise have insisted upon.

But Farr asked him to let him know if the plaintiff wanted to see him, or said anything about a settlement. On October 26th, as the doctor testified, the plaintiff said he thought "it would be better to effect a settlement with the road and not be bothering with lawyers; that he would like to talk with somebody about it; and that he said he did "not want to see any of his folks" about it. Dr. Palmer communicated the fact of this conversation, and, we think it fair to assume, the substance of it also, to Farr, who had been called to the hospital that day by Dr. Russell to see the leg dressed. He also advised Farr that the plaintiff was in a suitable condition physically to make a settlement. An arrangement was made for Farr to see the plaintiff the next day. The evidence makes it probable that Dr. Palmer made the arrangement with Dr. Russell. Dr. Russell gave directions that no opiates be administered in the meantime to the plaintiff. The plaintiff was not told of the arrangement, nor did he know that he was to meet Farr, nor that a settlement was to be attempted, until the nurse was preparing to move him from his cot in the general ward to a private

room.   Farr.came to the meeting with a general release all prepared, except filling blanks, and with one hundred five dollars bills, which at some time during the negotiation were laid in a pile on the table before the plaintiff.

Although the evidence is clear that the plaintiff was mentally competent, at the time, to make a settlement, it appears that morphia at different times had been administered to him from time to time to alleviate suffering, and that while under its influence he was "dopy," and his mind was not clear. And it would be a warrantable inference from the testimony, that by reason of the shock of the accident, the nature of his injury and the condition of his leg, that he was naturally, if not necessarily, weakened to some extent in body, and unstrung in mind and in will, and therefore more susceptible to the influence of impressions, false or otherwise.

Upon this evidence, with the additional fact as the plaintiff claims it to be, that the settlement was unfair and grossly inadequate, it is contended in his behalf that the jury were warranted in finding the settlement to have been fraudulently procured, in these respects:—that the defendant, through the opinion of Dr. Palmer, knew that the leg could not be saved; that the plaintiff, also through the opinion of Dr. Palmer, the defendant's paid agent, believed that the leg could be saved, that the defendant was bound in good faith to disclose to him the truth, and that, having failed to do so, it was equivalent to a false representation, and the concealment being intentional, it was fraudulent.

The law is unquestioned. If, with intent to deceive, one party to a contract conceals or suppresses from the other a material fact, which he is in good faith bound to disclose, it is tantamount to a false representation.   The gist is fraudulently producing a false impression upon the mind of the other party. *Stewart* v. *Wyoming etc., Co.,* 128 U. S., 383.   If a party conceals any fact material to the transaction, and peculiarly or exclusively within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if it were expressly denied. *Thomas* v. *Murphy,* 89 Minn., 358; *Maynard* v. *Maynard,* 49 Vt., 297; *Prentiss* v. *Ross,* 16 Maine, 30; *Atwood* v. *Chapman,* 68 Maine, 36.

The suppression must relate to a material fact, known to the party, and which it is his legal duty to communicate to the other party. The duty may arise from a relation of trust, from confidence, from inequality of condition and knowledge. *Jordan* v. *Pickett,* 78 Ala., 331. Concealment implies design, purpose. Mere silence is not of itself concealment. *Stewart* v. *Wyoming etc., Co.,* supra. Whatever the purpose, if the party is not misled, no relief can be had for fraud. *McDonald* v. *Christie,* 42 Barb., 36. We think that these citations cover every phase of suppressio veri that is open to argument in this case. And the question now is whether the facts bring this case within these rules.

In support of the charge of fraud and deception, the plaintiff relies upon the conduct and statements to him of three persons, Dr. Palmer and Mr. Farr, the defendant's superintendent, and Dr. Russell, the surgeon in charge of the hospital. Of Dr. Russell it need only be said that he seems to have believed from the first that the leg would not be saved, and so expressed himself to the plaintiff. Though he assisted in making the arrangement for the meeting between the plaintiff and Farr, we do not discover that he did anything more than was proper for a surgeon in charge to do under such circumstances. On the contrary he seems to have taken especial pains that the plaintiff's mind should not be clouded by the effect of opiates at the time of the meeting, and actuated, as we think the evidence shows that he was, by the belief that the proposed settlement was inadequate, he also took especial pains to make certain that the plaintiff fully understood and appreciated what he was doing. We do not think the situation called upon Dr. Russell to intervene, like a guardian of the plaintiff.

The plaintiff in his brief says that Dr. Palmer "was secretly the defendant's paid agent to procure a settlement." We have already said that he was employed by the defendant, and that that employment was not known by the plaintiff. What would have been the result if Dr. Palmer in the course of his employment had misled the plaintiff by false statements of his belief as to the probability of saving the leg, or if he had falsely created an unfounded belief that the leg would be saved, for the purpose of inducing the plaintiff to make an easy settlement, we need not discuss. We think that a finding of fact to that effect could be based only upon infer-

ences not warranted by the evidence. It may be conceded that Dr. Palmer, as the plaintiff testified, told him at one time that he "thought the leg would be saved." But that of itself is not enough. If it appeared that this statement of opinion was intentionally false, it might probably be inferred, under the circumstances, that the purpose was fraudulent. But it does not so appear. The opinion was, as it turned out, a mistaken one. But it is asserted, and not denied, that the plaintiff's condition became worse about a week after the settlement, and yet the amputation was deferred two weeks longer. No reason for the delay is suggested, unless it was that further efforts could be made to save the leg.

Mr. Farr's part in the settlement has already been described.

The situation then was this. Mr. Farr, we assume, feared that the leg could not be saved. Indeed, he may have had a strong conviction of it. The plaintiff had the opinions of two doctors to be guided by, one unfavorable, and the other more favorable, but not fraudulent. He hoped to save the leg. He says he believed he would save it. He chose to act upon that belief, and he made what may be called an improvident settlement. It is asserted and not denied that he said he meant to "have the money and keep the leg." This statement indicates, we think, that he knew that the question of saving the leg was debatable, or, at least, had been debated.

Under these circumstances we think it cannot be said properly that the defendant, or its agent, had fraudulently produced a false impression upon the mind of the plaintiff; or, that the probability of saving the leg was a fact peculiarly or exclusively within the knowledge of the defendant or its agents; or, that it was the defendant's legal duty to communicate to the plaintiff the belief of its agents as to a recovery. Although the plaintiff was weakened, as already stated, we think the case shows, almost beyond dispute, that he clearly understood what he was doing, that he was in a condition to judge intelligently and decide for himself; that he knew or ought to have known the risk or chance he was taking, and therefore that there was no such inequality of condition or knowledge as made it the legal duty of the defendant to impart its own belief to him. The verdict was clearly wrong, and the motion for a new trial must be sustained. It is unnecessary to consider the exceptions.

*Motion for a new trial sustained.*