[Civ. No. 6261. First Appellate District, Division One.—December 15, 1928.]

AMELIA LENCIONI, Administratrix, etc., Plaintiff, v. FIDELITY TRUST & SAVINGS BANK OF FRESNO (a Corporation), Respondent; MINNIE HELENE SETCHEL, Appellant; AMELIA LENCIONI et al., Interveners.

F. de Journel and Conley, Conley & Conley for Appellant.

Cosgrave & Barstow for Respondent Bank.

Harris & Hayhurst for Interveners.

CAMPBELL, J., *pro tem.*—This is the second appeal in this action, the first being presented by appellant herein from a judgment of nonsuit entered against her upon her cross-complaint (*Lencioni* v. *Fidelity Trust & Savings Bank,* 69 Cal. App. 325 [231 Pac. 366]). On that appeal the judgment was reversed, with directions to the trial court to deny the motion for nonsuit and proceed with the trial of the case. A petition for rehearing in the supreme court was denied, and the trial of the case was proceeded with as directed by the appellate court in its order reversing the judgment of nonsuit. Defendant Fidelity Trust & Savings Bank filed a pleading denominated "supplemental amended

complaint,'' praying that the consignment creditors and the general creditors of the Setchel Fruit Company (the Setchel Fruit Company having gone into the hands of a receiver on October 3, 1921, and was adjudged bankrupt) might be made parties. Thereupon the consignment creditors intervened and filed a cross-complaint, and one of the general creditors, the Barrett-Hicks Company, on behalf of the general creditors, also filed an answer and cross-complaint against Minnie Helene Setchel. Appellant Minnie Helene Setchel, defendant and cross-complainant, duly answered the supplemental amended complaint of the bank, the cross-complaint of the intervening consignment creditors and the Barrett-Hicks Company. Judgment was rendered that Minnie Helene Setchel, cross-defendant and cross-complainant, take nothing by her several cross-complaints; that Fidelity Trust & Savings Bank retain $1,125 for its compensation and the further sum of $2,273.33 for its expenses and attorney's fees; that from the balance in its hands, being $23,045.20, the trustee bank pay to the estate of Monge, deceased, $11,673.14; to the estate of B. Lencioni, deceased, $1,313.40; to B. Lencioni and Company, a copartnership, $985.35; to O. Toccini, $3,567.66; to G. Schlichting, $1,739.33, being consignment creditors of the Setchel Fruit Company, and that the balance in its hands, $3,766.32, be paid to the general creditors to be divided among them in proportion to their claims.

In *Lencioni* v. *Fidelity Trust & Savings Bank, supra,* in an opinion by Mr. Justice Langdon, then presiding justice of division two of this court, the evidence supporting appellant's claim is fully reviewed. There the court says: "W. Flanders Setchel, from whom she (appellant) had been divorced at the time of the trial, testified that the crops belonging to the appellant were handled in the years 1918, 1919 and 1920 by the Setchel Fruit Company 'on consignment' and 'the proceeds were credited on the books'; that the total amount credited to Mrs. Setchel for these years was 'some $200 or $300 short of $38,000,' and that no portion of that amount of money was ever paid in cash or otherwise to Mrs. Setchel; that in the latter part of 1920 he had a conversation with Mrs. Setchel with reference to the disposition of this money; that Mrs. Setchel was 'very insistent upon receiving payment of her moneys'; that 'he

wanted the money to stay—so he could use it'; that he 'asked her if some arrangement could be made whereby it was not to be paid to her just at that time'; . . . that Mrs. Setchel was induced by him 'to allow the money to remain there'; that at the time he requested Mrs. Setchel to let this money remain with the company 'it was understood' that the money would be 'repaid out of the proceeds of the crops of the following year and in making the arrangements to secure certain creditors of the Setchel Fruit Company I made reservation in order to protect that money and induced her to agree to that.' 'What was to be done with this money which I retained in my hand was to take care of the property and develop the crops of 1921.' 'The Setchel Fruit Company's books will show the amount of money so belonging to Mrs. Setchel which was used for the purpose of making the crop of 1921.' . . . Mrs. Setchel's testimony appears in the record in the form of a deposition wherein she says: 'I think it was in the early fall of 1920 that I made inquiries about the proceeds of these 91½ acres of the Carmelita, but I had been asking for money from my place the whole year. I never got any. . . . When I asked him for some money he came back and asked me to advance him—to let him use the money, rather, that he owed me, to crop the Carmelita now; he must have told me the right amount then because he said it would cost something like $30,000. . . . I agreed that he could have the money to farm the Carmelita and he was to give a mortgage to the bank and there was to be a trust deed in which I was to be paid back first of all.' We are disposed to agree with appellant that there is enough in the foregoing testimony to support Mrs. Setchel's claim that she made advances to W. Flanders Setchel within the meaning and intent of the mortgage and declaration of trust heretofore discussed upon a motion for nonsuit and with no evidence before the court to contradict or destroy the force of the foregoing testimony. It is to be remembered that the Setchel Fruit Company was not the owner of the land comprising the Carmelita Vineyard. Upon the company's books and in legal effect the corporate funds were not used to develop a crop upon land not owned by said company, but such funds were used in reducing the company's indebtedness to one of its consignment creditors, Mrs. Setchel— a legitimate use of such funds—and then W. Flanders

Setchel, individually, took this money, so paid by the company, to Mrs. Setchel, under a private arrangement with her and used it to develop a crop upon the Carmelita Vineyard which he had mortgaged in advance for the benefit of the creditors of the Setchel Fruit Company. The fact that this was accomplished in one instead of two steps surely cannot prejudice Mrs. Setchel in a court of equity. She is, obviously, a woman unacquainted with business methods and she had no voice in the selection of the method adopted in carrying out the scheme agreed upon. . . . However, the bank should have an opportunity to prove, if it can, its allegations regarding estoppel, and to disprove, modify or explain by other evidence the matters heretofore stated which Mrs. Setchel has introduced into the record.'' The same facts summarized in the quotation from the opinion on the former appeal as given by Mrs. Setchel in her deposition were again testified to by her on the issues raised by reason of the appearance in the action of the interveners.

Although the facts are rather fully set out in the opinion in *Lencioni* v. *Fidelity Trust & Savings Bank, supra,* it is proper to restate a few of the salient ones here. W. Flanders Setchel owned all the stock of the Setchel Fruit Company with the exception of the qualifying shares issued to other directors. The Carmelita Vineyard comprised a tract of land of 323½ acres, 91½ of which were owned by Mrs. Setchel, and the remaining 232 acres stood in the name of W. Flanders Setchel. The entire tract was a fruit farm and vineyard and was farmed as a unit. Becoming heavily indebted in the year 1920 to various creditors, including growers who had consigned their fruit, and being threatened, Setchel contrived to pay these consignment creditors about half the amount due them and executed a mortgage to Fidelity Trust & Savings Bank for the balance due all creditors, covering the crops on his 232 acres for the year 1921, and at the same time executed a declaration of trust wherein he specifically set forth the conditions and purposes of the trust. By these instruments the consignment creditors were given a preference for the balance due them over the general creditors. Mr. and Mrs. Setchel, though subsequently divorced, were at that time living together. Foreseeing that he might not have money available with which to produce the 1921 crop, Setchel suggested to his creditors that he might have

to borrow money and that he should be given authority to do so. This appeared entirely reasonable to the creditors, and it was accordingly provided in the crop mortgage and trust instrument that anyone advancing money for this purpose, not exceeding $30,000, should have a preferred right to its repayment secured by the mortgage in advance of the other creditors.

■ On the former appeal the case was remanded for trial for the defendant and cross-complainant bank, and since the consignment and general creditors have been made parties, also for them, to establish, if they could, the allegations regarding estoppel and to disprove, modify or explain by other evidence the above matters testified to by Mr. and Mrs. Setchel. We shall therefore direct our inquiry as to whether the finding that the agreement alleged to have been made to reimburse appellant for advances to produce the 1921 crop was never made is supported by the evidence; for, if the evidence fails to support this finding, but establishes to the contrary that appellant did advance the money to produce the 1921 crop under an agreement with W. Flanders Setchel in accordance with the provisions of the trust, the judgment must be reversed.

We have not only considered the testimony set out in the briefs of appellant, respondent bank and the interveners and cross-complainants, but have read the entire record and have found no evidence to rebut the testimony of W. Flanders Setchel, F. De Journel, and appellant, Minnie Helene Setchel, that the money due her as a creditor of the Setchel Fruit Company was, under an agreement between Mr. and Mrs. Setchel, used in the production of the 1921 crop and was to be repaid out of the proceeds of the crop ahead of the other creditors, and that she was to be protected by the crop mortgage and trust agreement, and the testimony of M. J. Hall, an employee of the Setchel Fruit Company, that the moneys due Mrs. Setchel, entered on the books of the company as ''Carmelita Account,'' were expended in the care and cultivation of the Carmelita ranch during 1921.

■ Respondent urges in support of the finding that the contract between Mr. and Mrs. Setchel was not entered into; that the Carmelita Vineyard was cared for as a unit by Mr. Setchel; that no segregation either of receipts or expenses was made, and was to all intents and purposes a community

proposition; that Mrs. Setchel failed to mention her claim for advances in the fall of 1921, when she made a claim to the bank for her prunes taken under the crop mortgage, and that the contemporaneous acts of the parties show an utter absence of any intention to claim that Mrs. Setchel was in any way interested in the advances.

Of the numerous authorities cited in support of the first contention that no segregation of either receipts or expenses was made with respect to the raising of crops and therefore the two tracts of land farmed together were so farmed as a community proposition, wherein the facts are at all analogous, is *Dean* v. *Bailey*, 50 Ill. 484 [99 Am. Dec. 533], wherein the court says: ''Where the husband and wife live upon a farm which, together with the stock and implements upon it, have been bought with the money of the wife, the husband may exercise the same care and control over such personal property as he would over his own, and in the eyes of the public have the same freedom in its use without its thereby becoming liable to the payment of his debts, . . . but it does not follow, because the wife merely allows her husband to have general use and control over her personal property, such use and control being of a character consistent with their common interests, and the proper enjoyment of it by both, that it should thereby become liable for the payment of his debts.'' In this state by a long line of authorities it is held that the profits of separate property are by law expressly declared to be the separate property of the owner of the land or personalty whence they are derived (5 Cal. Jur. 300, and cases cited).

As to respondents' next contention that appellant failed to notify the bank of her advances to her husband, it may be said the testimony shows that appellant consented to be charged and there was charged against her share of the credits of the Carmelita Vineyard account the expense of raising the 1921 crop, and the fact that her money was actually so used is in no way rebutted. She had a right to assume that the trustor Setchel, then her husband, did not entertain any intention to defraud her by failing to give sufficient and proper notices to the bank trustee, which was set forth as his duty in the declaration of trust. When her relations with her husband became strained and there arose some misgivings on or before October 18, 1921, she

did notify the trustee, and such notice was given before any distribution of the funds was made. At the trial the trust officer of the bank testified that he still held the funds intact and to the amount on hand.

The crop mortgage provides: "Also to secure the repayment of all advances made by any corporation, individual or party, or their assigns, to the mortgagor not exceeding for such advances the sum of Thirty Thousand ($30,000.00) Dollars." As a part of the mortgage transaction a declaration of trust was executed by Setchel to the bank in which the crop mortgage is referred to and which provides: "That any corporation, individual or party, may at any time during the life of this agreement, advance to W. Flanders Setchel for the purpose of producing, harvesting, packing and marketing the crops described in said mortgage a sum or sums not to exceed $30,000.00, as specified in said mortgage, and the said W. Flanders Setchel shall, after receiving said loan, notify in writing the Trustee herein of the corporation, individual or party making said loan . . . and thereafter said corporation, individual or party shall be constituted the first beneficiary under this trust for the amount loaned not to exceed $30,000.00, and said sum or sums so advanced or loaned shall be repaid to the said corporation or individual or party out of the first proceeds of said crop."

Neither the trustee nor the creditors were in any way injured by Setchel's failure to notify the trustee of the money advanced by Mrs. Setchel, or that he did not mention Mrs. Setchel because he was trying to get the advance money back for the Setchel Fruit Company, as he testified: "Q. Why didn't you tell him then Mrs. Setchel was the one who had advanced the money and not the Setchel Fruit Company? A. I told him it was advanced for the Setchel Fruit Company. . . . At that time there were domestic affairs which prompted me to take on the attitude of looking after my own interest rather than Mrs. Setchel's. . . . And from that time on, a little before that, my attitude was rather to look after the Setchel Fruit Company and let the rest be subordinated to it. Q. In other words, you were trying to get the money back for the Setchel Fruit Company instead of for Mrs. Setchel? A. That is probably the interpretation of it."

Equity looks beyond the form of a transaction and shapes its judgments in such a way as to carry out the

purposes of the parties, dealing with the substance of transactions and treats their forms as of secondary importance (*Campbell* v. *Freeman,* 99 Cal. 548 [34 Pac. 113]; *Vance* v. *Anderson,* 113 Cal. 538 [45 Pac. 816]). Since under the contract the notices were to be given by Setchel and not by Mrs. Setchel, and since the failure to give them neither prejudiced the trustee nor the creditors, the maxim applies—"equity will consider as done that which ought to have been done" (1 Pomeroy's Equity Jurisprudence, secs. 365, 370, 373; *Poultry Producers, etc.,* v. *Nilsson,* 197 Cal. 245 [239 Pac. 1086]).

As to the charge of concealment it may be said that there was no concealment that amounts to fraud or deceit for the reason that the trustee, as well as all of the creditors, knew that by the terms of the mortgage and declaration of trust their interest, rights, or claims did not come into existence until the necessary moneys borrowed to produce the crop had been repaid. "The concealment of facts by a party to a contract, which amounts to fraud, implies design or purpose, and mere silence is not of itself concealment" (*Barrett* v. *Lewiston, B. & B. St. R. Co.,* 110 Me. 24 [85 Atl. 306]). "We do not generally speak of a person concealing a thing unless he is in some way called upon to produce it" (*Watertown Sav. Bank* v. *Mattoon,* 78 Conn. 393 [62 Atl. 624]). So, also, in estoppel, there must be something wilful and culpable in the silence which allows another to place himself in an unfavorable position on the faith or understanding of a fact which the person remaining silent can contradict (*Eltinge* v. *Santos,* 171 Cal. 278 [Ann. Cas. 1917A, 1143, 152 Pac. 915]; *Stern* v. *Sunset Road Oil Co.,* 47 Cal. App. 334 [190 Pac. 651]).

The following language of the court on the former appeal is apropos here: "So far as the record shows, the creditors of the Setchel Fruit Company had no claim upon the proceeds of the crop to be raised on Mrs. Setchel's land in 1921, but her husband's credit was seriously involved, and she not only consented to the mortgage of her future crop, but also to pay the expenses of raising the same out of moneys due her, provided only that this expense should be repaid to her out of the crop before the money was turned over to the creditors. The fairness of this demand is obvious, and it appears in the record that if the crop had not been a failure, it would

have paid the expense of its production and furnished ample money to satisfy all creditors. The incidental unfortunate circumstance that the crop was a failure does not change the equity of allowing the expense of its production to be first paid out of its proceeds."

We have examined the authorities cited by respondents and question not the principles they enunciate, but merely their application to the situation presented here.

As the evidence without conflict establishes the fact that appellant advanced funds to produce the crop of 1921, as provided for in the crop mortgage and declaration of trust, and is therefore entitled to be repaid such funds, in advance of other creditors, the judgment must be reversed, and it is so ordered.

Tyler, P. J., and Knight, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on January 12, 1929, and the following opinion then rendered thereon:

THE COURT. — Rehearing is denied. It is true the opinion quotes from the opinion on the former appeal in which the judgment for nonsuit was reversed and the cause remanded for trial to permit the defendant and cross-complainant bank to establish, if it could, the allegations regarding estoppel and to disprove the evidence offered in support of the claim of cross-complainant Minnie Helene Setchel. While the fact that the final trial was had before a different judge was not called to our attention, it will be noted that the opinion states: "The same facts summarized in the quotation from the opinion on the former appeal as given by Mrs. Setchel in her deposition were again testified to by her on the issues raised by reason of the appearance in the action of the interveners"; and, further, "we have not only considered the testimony set out on the briefs of appellant, respondent bank and the interveners and cross-complainants, but have read the entire record," it follows, therefore, that the evidence adduced at the trial of the case originally, from which we have quoted, is not given the character *res judicata.*

Petitions by respondents to have the cause heard in the supreme court, after judgment in the district court of appeal, were denied by the supreme court on February 11, 1929.

All the Justices present concurred.