[Sac. No. 3117. In Bank.—October 1, 1925.]

POULTRY PRODUCERS OF CENTRAL CALIFORNIA, INC. (a Corporation), Respondent, v. J. LEONARD NILSSON, Appellant.

[1] CO-OPERATIVE CORPORATIONS—MARKETING OF EGGS AND POULTRY—SUBSCRIPTION AGREEMENT—CONSTRUCTION.—Where a subscription agreement provided that a nonprofit association for the marketing of eggs and poultry was to be organized when subscriptions totaling ten thousand dollars were procured at the rate of ten dollars

per share and on the basis of one share for every thousand hens, or a majority fraction of a thousand hens, owned by the subscriber, the minimum subscription in any event being one share, the term "hens," as used in such subscription agreement, included hens and pullets.

[2] ID.—SUBSCRIPTIONS—CONDITIONS.—Ordinarily it is not a condition precedent to the liability of subscribers that the full sum should be first subscribed, where there is nothing in the agreement to that effect; nor is it ordinarily a condition precedent to the formation of the corporation or consummation of the contract of membership that the entire capital provided by the articles or charter be subscribed; but conditions may be inserted in the contract making the organization of the proposed corporation conditional upon the securing of subscriptions for a certain amount, and in such cases unauthorized subscriptions cannot be counted in making up the requisite amount to be subscribed before organization.

[3] ID.—MEMBERSHIP—CONSTRUCTION OF SUBSCRIPTION AGREEMENT.— The terms of such subscription agreement were not violated by permitting owners of "minority fractions" of one thousand hens to become stockholders in the association, as the clause therein that the signers "do hereby subscribe to and agree to purchase said shares of such stock at the rate of one share for every thousand hens or a majority fraction of a thousand hens owned by each subscriber, the minimum subscription in any event being one share," is to be interpreted as merely referring to the rate or basis of the issuance of the stock, and not as a limitation upon those who are entitled to subscribe.

[4] ID. — VIOLATION OF CONTRACT — ACTION AGAINST SUBSCRIBER — LIQUIDATED DAMAGES — SUBSCRIPTIONS — FINDING. — In this action against a subscriber to such subscription agreement for liquidated damages arising from his refusal to deliver eggs to the plaintiff association, the contention of the defendant that *bona fide* subscriptions to the stock of the association were not procured pursuant to the provisions of the subscription agreement cannot be sustained.

[5] ID.—SIGNING OF PRODUCE SALE AGREEMENT ATTACHED TO SUBSCRIPTION AGREEMENT—PERFORMANCE—EQUITY.—Where it was provided in a proposed form of "produce sale agreement," which was attached to and formed a part of the subscription agreement, that in the event contracts similar in terms were not secured by a specified date from owners of at least one million hens, the produce sale agreement should be null and void, and no obligation should be enforceable thereunder, the fact that the owners of approximately only two hundred thousand fowls actually and physically signed and executed the produce sale agreement by said

2.   See 6 Cal. Jur. 766; 7 R. C. L. 231.

specified date did not exonerate a defaulting subscriber from liability, where owners owning more than a million hens, including pullets, had signed the subscription agreement prior to said specified date, and the failure to sign said produce sale agreements was not due to the fault of the association, but was due entirely to the omission of the subscribers to perform their duty of signing said sales agreements; and since the produce sale agreement of a defaulting subscriber (which he agreed to sign and which was valid) ought to have been signed, equity will regard it as having been properly executed.

[6] ID. — EQUITY. — Equity looks upon things agreed to be done as though they were actually performed, the true meaning of which is that equity will treat the subject matter as to collateral consequences and incidents in the same manner as if the final acts contemplated by the parties had been executed exactly as they ought to have been.

[7] ID. — REFUSAL TO SIGN PRODUCE SALE AGREEMENT — TIME — WAIVER.—A defaulting subscriber cannot justify his refusal to sign such produce sale agreement upon the ground that the terms of the agreement he was asked to sign were not substantially the same as those set forth in the form of agreement attached to the subscription agreement, where this objection was not made when the instrument was offered to him for execution; and it is too late for him to thereafter seek to take advantage of matters which, assuming the objection to have been good if timely made, could have been easily cured at the time.

(1) 29 C. J., p. 347, n. 43 New.  (2) 14 C. J., p. 538, n. 36. (3) 2 C. J., p. 992, n. 56 New.  (4) 2 C. J., p. 992, n. 56 New. (5) 2 C. J., p. 992, n. 56 New.  (6) 21 C. J., p. 200, n. 11.  (7) 2 C. J., p. 992, n. 56 New.

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Modified and affirmed.

The facts are stated in the opinion of the court.

Dozier & Dozier, J. E. Pemberton, Dozier, Kimball & Dozier and Harry F. Davis for Appellant.

Sapiro, Neylan & Ehrlich, Sapiro, Levy & Hayes and Sapiro & Hayes for Respondent.

6. See 10 Cal. Jur. 505; 10 R. C. L. 383.

WASTE, J.—The defendant has appealed from a judgment in favor of plaintiff, decreeing specific performance and awarding damages for violation of a contract. Plaintiff was a nonprofit association, organized and incorporated for the purpose of fostering and promoting the business of raising poultry and marketing eggs and poultry by co-operative methods. Defendant signed a preliminary subscription agreement, with a large number of other poultry producers, providing for the organization of the association, and agreed to purchase four shares of its capital stock, at a price of ten dollars per share, and on the basis of one share for every 1,000 hens, or a majority fraction of 1,000 hens, owned by him. At the time he signed the subscription agreement he paid ten dollars, representing twenty-five per cent of the price of the stock subscribed for, which advance payment, in accordance with the terms of the agreement, was to be credited on the purchase price of the stock when the organization of the association was completed. There was attached to the subscription agreement when signed by the defendant and the other subscribers a form of "produce sale agreement," by the terms of which it was provided that, in consideration of the mutual obligations therein contained and of the agreements by each of the parties thereto to be performed, and in pursuance of the preliminary (subscription) agreement, the association agreed to purchase and market, and the subscriber agreed to sell and deliver to it, such of the eggs and poultry produced by him during the years 1917, 1918, and 1919, as the defendant intended "to sell or market in any event," under the conditions thereinafter set out.

Among other provisions contained in the form of the proposed produce sale agreement was one to the effect that, as it would be impracticable and extremely difficult to determine the actual damage resulting to the buyer association, should the seller fail to deliver to it the eggs and poultry agreed to be delivered, the seller agreed to pay to the buyer five cents for each dozen eggs, and one dollar for each dozen commercial poultry sold, consigned, or marketed by or for him and not delivered to the buyer, as liquidated damages for the breach of the produce sale agreement in that regard.

The plaintiff association was subsequently incorporated and commenced carrying on the business for which it was

formed; but the defendant refused to sign the produce sale agreement when requested to do so, and thereafter sold 27,690 dozen eggs in violation of its terms. The association thereupon commenced this action to compel the defendant to execute the produce sale agreement and to specifically perform the same, and for liquidated damages for its breach. It alleged, generally and specifically, that it and the other subscribers had fully performed all the conditions of the subscription agreement and of the produce sale agreement, which the defendant had agreed to execute. The various allegations of the complaint being controverted by the defendant in his answer, trial was had, at the conclusion of which judgment was entered in favor of the plaintiff and requiring the defendant to forthwith execute and deliver to the plaintiff duplicate copies of the produce sale agreement, and to specifically perform the same. It was further ordered that an injunction issue restraining the defendant from selling any eggs produced by him to persons other than the plaintiff association, and that plaintiff recover the sum of $1,384.50 liquidated damages for violation of the terms of the produce sale agreement, and the further sum of $30 unpaid balance due on the defendant's stock subscription. From that judgment, and the whole thereof, the defendant has appealed.

The action was tried and decided before the decision of this court in the case of *Poultry Producers of Southern California* v. *Barlow,* 189 Cal. 278 [208 Pac. 93], and of the district court of appeal in *Poultry Producers etc.* v. *Murphy,* 64 Cal. App. 450 [221 Pac. 962]. The appellant contends, and the respondent admits, that the decision in the Barlow case is controlling as to, and overrules that portion of the judgment in the present case which decrees specific performance of the produce sale agreement, and permanently enjoins the defendant from delivering eggs produced by him to others than the association. Respondent concedes that there must be a reversal of that portion of the judgment of the trial court, and it will be so ordered.

In *Poultry Producers* v. *Barlow, supra,* this court held that although the plaintiff was not entitled to specific performance of the produce sale agreement there under consideration, and which had been signed by the subscriber, either directly or indirectly, it was entitled to judgment for damages suf-

fered by it by reason of the breach of the defendant. Subsequently the identical contract in controversy here was considered by the district court of appeal in *Poultry Producers, etc.,* v. *Murphy, supra.* In that case, as in this, the subscriber for the stock of the association refused to sign the produce sale agreement, and sold eggs in violation of its terms. The court in that case, following the decision of this court in the Barlow case, held that the promise of the defendant to sign the produce sale agreement was valid and enforceable, and affirmed the judgment of the lower court directing defendant to sign the same, awarding the plaintiff liquidated damages for failure to deliver eggs in accordance with the terms of such agreement and for the balance due on the subscription for the stock. (See, also, *Anaheim Citrus Fruit Assn.* v. *Yeoman,* 51 Cal. App. 759 [197 Pac. 959]; *Co-operative Egg etc. Co.* v. *Taylor,* 122 Wash. 466 [210 Pac. 806]; *Tobacco Growers Co-op. Assn.* v. *Jones,* 185 N. C. 265 [33 A. L. R. 231, 117 S. E. 174].) Questions are raised on the appeal in this case, however, which were not advanced or considered in any of the above decisions.

Appellant's primary contention is that *bona fide* subscriptions of stock to the amount of $10,000, subject to the express conditions of the subscription agreement were not procured before the respondent corporation was organized. By the terms of the subscription agreement, the signers agreed to purchase shares of stock in the association to be formed at the rate of one share for every 1,000 hens, or a majority fraction of a thousand hens, owned by such subscribers, respectively, the minimum subscription in any event being one share. It was further provided that when *bona fide* subscribers to the capital stock of the corporation to the amount of $10,000 of stock should be procured, subject to the conditions in the agreement stated, the market director of the state of California should notify all the subscribers, and the subscription agreement should thereupon go into full force and effect, and the corporation should thereupon be immediately organized by the subscribers, who agreed to execute "at the proper time to be determined by the Directors of the corporation, agreements with the corporation for the sale of their products by the said corporation, in terms substantially the same as those set forth in the form of agreements" attached to the

subscription agreement. There was a final provision in the subscription agreement that if *bona fide* subscriptions to the stock of the corporation to the total amount of $10,000 should not be procured by January 1, 1917, the obligation of the subscribers should cease and terminate, and all expenditures necessarily or properly incurred in the preliminary work of organizing the corporation should be prorated between the subscribers in their respective proportions, and the balance divided and returned to them.

Following the stipulated facts, the trial court found that subscribers who owned only a *minority fraction* [italics are ours] of 1,000 hens, laying pullets, and nonlaying pullets were permitted to subscribe for one share of stock each, and that the total subscriptions to the stock of the corporation were sufficient to allow for its organization on October 30, 1916. Appellant first offers the suggestion that subscriptions for stock were limited to the owners of "hens," and that "pullets" should not have been included in arriving at the number of "hens" a subscriber had. Considerable evidence was introduced on the subject, from which the trial court might well conclude that, for the purposes for which the corporation was organized, the term "hens," as used in the provisions of the subscription contracts, included hens and pullets. [1] We are satisfied to accept the trial court's finding on that subject. The contention that the terms of the subscription agreement were violated when the owners of "minority fractions" of 1,000 hens were permitted to become stockholders in the respondent corporation presents a more vital question. [2] "Ordinarily it is not a condition precedent to the liability of subscribers that the full sum should be first subscribed, where there is nothing in the agreement to that effect; nor is it ordinarily a condition precedent to the formation of the corporation or consummation of the contract of membership that the entire capital provided by the articles or charter should be subscribed. But conditions may be inserted in the contract making the organization of the proposed corporation conditional upon the securing of subscriptions for a certain amount. In such cases, unauthorized subscriptions cannot be counted in making up the requisite amount to be subscribed before organization." (6 Cal. Jur., p. 766, par. 172.)

[3] The exact provision in the subscription agreement, following the clause wherein the producers agree to subscribe for the capital stock of the corporation, is as follows: "It is further understood and agreed that we and each of us will purchase and we do hereby subscribe to and agree to purchase said shares of such stock at the rate of one share for every thousand hens or a majority fraction of a thousand hens owned by each subscriber, the minimum subscription in any event being one share." Were it not for the concluding phrase, "the minimum subscription in any event being one share," and our understanding of the purposes for which the corporation was formed, we would be inclined to accept the view of appellant that only those producers owning at least a "majority fraction" of 1,000 hens were to become shareholders in the corporation. His argument finds some support in the finding of the trial court that preliminary to the organization of the respondent investigation by the State Market Commission and the organization committee of poultry producers established that the marketing of the products of at least 1,000,000 hens would be essential before the corporation could secure for the producers, who were about to become members, the substantial benefits of collective marketing and co-operative methods of handling eggs and poultry products. From this fact as a premise, appellant attempts to show that the sale of shares of stock to the amount required by the agreement, to producers owning at least a "majority fraction" of a thousand hens, based on the "law of averages," would probably result in securing subscriptions and produce sale agreements from the owners of a million hens. The condition in the agreement was therefore a limitation, appellant contends, under which producers having less than 500 hens were not eligible to become stockholders, and the phrase, "the minimum subscription in any event being one share," means that a share could not be divided into fractions.

It is respondent's contention that this clause is to be interpreted as merely referring to the rate or basis for the issuance of stock, and is not a limitation upon those who are entitled to subscribe; and that the contract taken as a whole should be interpreted to mean that those who own hens up to the number of a thousand are entitled to sub-

scribe for and receive one share of stock, and that those who own hens in excess of 1,000, to the extent of a majority fraction thereof, shall be entitled to subscribe for an additional share or shares of stock. The essential objects underlying the formation of the poultry producers into a cooperative association in this case, if we are to judge from the findings, were the inclusion, so far as practicable, of every producer in marketable quantities of the particular produce in the vicinity, and a resultant control and stabilization of the market for their products. We may readily assume that these objects might be seriously interfered with if there were any considerable number of producers owning 500 hens, or less, in the neighborhood. We may infer, therefore, as the trial court must have done, that it was the purpose of the promoters of the enterprise to include within the organization the smaller producers as well as the larger owners of poultry, the "minimum subscription in any event being one share," and the larger subscriptions being based on the number of hens the particular subscriber owned. The subscription contract is susceptible of an interpretation which would conform to these essential purposes. It contains no provision expressly limiting subscribers to those who own a thousand hens or at least a majority fraction of that number. The trial court, whose duty it was in the first instance to construe the provision, has accepted the view placed on the agreement by the respondent, and we are not disposed to hold that its interpretation of the contract was incorrect. [4] It follows, therefore, that the contention of appellant that *bona fide* subscriptions to the stock of the respondent corporation were not procured pursuant to the provisions of the subscription agreement cannot be sustained.

[5] Appellant advances another reason why he should not be held in damages for his failure to sell his poultry products to the respondent in keeping with the provisions of the produce sale agreement. His contention rests upon the fact that the owners of at least 1,000,000 hens did not sign the produce sale agreement by January 1, 1917. In the proposed form of that agreement attached to and forming a part of the subscription agreement, it was provided that in the event the respondent failed to secure by January 1, 1917, contracts similar in terms from the owners of

at least 1,000,000 hens, the sales contract should be null and void, and no obligation should be enforceable thereunder. The trial court found that while the producers who executed the subscription agreement were the several owners, collectively, of 667,284 hens, 169,052 laying pullets, and 169,052 nonlaying pullets, making a total of 1,005,388 hens, laying pullets, and nonlaying pullets, and actually subscribed for capital stock of the corporation to the amount of $10,000, the owners of approximately only 200,000 fowls actually and physically signed and executed produce sale agreements prior to the first day of January, 1917. The owners of some 600,000 fowls signed after that date, and the owners of about 200,000 have never executed the agreements. Respondent contends that as producers owning more than a million hens, including pullets, signed the subscription agreement before January 1, 1917, the condition contained in the draft of the proposed produce sale agreement had been met. That is not physically and literally the fact, but the situation existing was, so far as the record discloses, due to no fault of the respondent, but was due entirely to the failure of the defendant and other subscribers to perform their duty of signing the sales contracts. The trial court found that if they had so performed that duty the association would have had by January 1, 1917, contracts from the owners of a million hens. It is a maxim of jurisprudence that "that which ought to have been done is to be regarded as done, in favor of him to whom, and against him from whom, performance is due." (Civ. Code, sec. 3529.) [6] Equity looks upon things agreed to be done as though they were actually performed, "the true meaning of which is that equity will treat the subject matter as to collateral consequences and incidents in the same manner as if the final acts contemplated by the parties had been executed exactly as they ought to have been." (*Daggett* v. *Rankin*, 31 Cal. 321, 327; *Beverly* v. *Blackwood*, 102 Cal. 83, 91 [36 Pac. 378]; *Poultry Producers* v. *Murphy*, *supra*.) The produce sale agreement which appellant agreed to sign, by which he contracted to sell his products to respondent, was a valid one. If it had been executed, and its terms breached, respondent would have been entitled to damages suffered by it by reason of the breach—in this case the liquidated damages

fixed by the agreement itself. (*Poultry Producers, etc.,* v. *Barlow, supra.*)   The produce sale agreement ought to have been signed.   It may now be regarded in equity as having been properly executed.

[7] Appellant has offered, in defense of his refusal to sign the produce sale agreement, the contention that the terms of the agreement he was asked to sign were not "substantially the same" as those set forth in the form of agreement attached to the subscription agreement.   When respondent was ready to begin transacting business, its secretary notified the defendant to that effect, some time prior to January 1, 1917, and requested payment of the balance due on his stock subscription, at the same time sending him, and requesting that he sign, what purported to be substantially a reprint of the original produce sale agreement. The provision relating to the securing of similar contracts from the owners of a million hens was omitted from the draft, and in a few minor details it otherwise differed from the original.   In response to the demand appellant went to San Francisco, some time after the first of the year, and met representatives of the respondent in conference over the matter.   At that meeting he offered no objection to the manner in which the subscriptions had been secured, or the corporation formed, or to the form of the instrument offered for his signature.   He declined to execute the produce sale agreement, assigning as his sole reason for such refusal that it called for the sale to the corporation of all eggs and poultry produced by him, when he had in fact, he contended, only agreed to sell to it any surplus of such products as he might desire to dispose of after selling to others.   Claiming to have contracts with others for the sale of his poultry products, he offered to sell to the corporation any surplus he might have after supplying his customers, a proposition he repeated in his answer filed in this action.   At some time during the negotiations he tendered, and offered to pay respondent, the unpaid balance of the purchase price of the stock.   The trial court found against the contention that the agreement did not embody appellant's real contract with the respondent for the sale of his products to it.   As to the objection first made during the trial that the contract differed in other particulars from the one attached to the subscription agreement, appellant

should have made those objections when the instrument was offered to him for execution. It is too late for him to now seek to take advantage of matters which, assuming the objections to have been good if timely made, could have been easily cured at the time.

The judgment is modified by striking therefrom the portion decreeing specific performance of the produce sale agreement and granting an injunction to prevent the breach of its terms. In all other respects the judgment is affirmed.

Richards, J., Shenk, J., and Lawlor, Acting C. J., concurred.