# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-1752 & 05-1814

IN RE

UNITED AIR LINES, INC.,

*Debtor.*

U.S. BANK NATIONAL ASSOCIATION,

*Appellant,*
*Cross-Appellee,*

*v.*

UNITED AIR LINES, INC.,

*Debtor-Appellee,*
*Cross-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 04 C 6643, 04 C 6644, 04 C 6885—**John W. Darrah**, *Judge.*

ARGUED SEPTEMBER 7, 2005—DECIDED FEBRUARY 13, 2006

Before CUDAHY, MANION, and SYKES, *Circuit Judges.*

CUDAHY, *Circuit Judge.* The fundamental question in this consolidated appeal is when title to funds held in trust passes to a beneficiary. That question is broad, and an imprecise resolution might have far-reaching implications for, among other things, the law of secured transactions. The facts of this appeal, however, limit its scope. While this

appeal involves a basic question about secured-lending relationships, it more importantly involves a beneficiary on the brink of bankruptcy. How to resolve this fundamental question in this particular situation is not easy.

The cases underlying this consolidated appeal involve disputes relating to two construction bonds that the California Statewide Communities Development Authority (the Authority) established to finance a new cargo terminal at Los Angeles International Airport (LAX). That terminal was to belong to United Air Lines, Inc. (United), and as almost every air traveler knows, United entered bankruptcy in late 2002. These cases come to this Court as the consolidated appeal of two separate proceedings in the bankruptcy court. In one proceeding, HSBC Bank USA (HSBC) filed a motion seeking relief from an automatic stay so that it could distribute to bondholders approximately $4.9 million that it held as indenture trustee. In the other proceeding, United sued U.S. Bank National Association (U.S. Bank) seeking a turnover of construction funds.

The issues on appeal are whether the district court correctly affirmed (1) the bankruptcy court's grant of summary judgment to United with respect to its prepetition reimbursement for work completed prepetition; (2) the bankruptcy court's grant of summary judgment to U.S. Bank with respect to United's postpetition reimbursement request for prepetition work; and (3) the bankruptcy court's grant of HSBC's motion for relief from the automatic stay. The district court properly affirmed the bankruptcy court's dispositions and we affirm.

## I. Background

In 1997, the Authority issued $190,240,000 in bonds on behalf of United to fund construction of an LAX cargo terminal. Chase Manhattan Bank and Trust Company, N.A. (Chase) served as indenture trustee pursuant to the

agreements underlying the bonds. In 2001, the Authority issued $34,590,000 in bonds on behalf of United to provide additional funding. U.S. Bank served as indenture trustee for the agreements underlying those bonds. On December 9, 2002, United entered Chapter 11 bankruptcy.

### A.  The Bond Agreements

The 1997 and 2001 bond agreements share the same basic structure and are governed by California law. A trust agreement and a payment agreement underlie both bonds. The Authority first sold the bonds and deposited their proceeds into construction funds. The money in these funds is pledged for the repayment of principal and interest on the bonds and is held in trust for the bondholders. United is obligated to make these payments. The construction funds themselves, however, were designed to reimburse United for construction costs it incurred on the LAX project. Although the structure of the funds is similar, we discuss each in turn for clarity.

On November 1, 1997, the Authority entered into a trust agreement (the 1997 Trust Agreement) with Chase, which HSBC succeeded in 2003. Under the 1997 Trust Agreement, the Authority issued bonds in the aggregate sum of $190,240,000. On the same day, United and the Authority entered into the 1997 Payment Agreement governing the bonds. This Agreement requires that United make periodic payments to HSBC to cover principal and interest due on the bonds. Unless United is in default in its payment obligations, HSBC is to pay the costs of projects upon United's written request. Any money remaining in the funds is to be used to pay bondholders after United completed the LAX cargo terminal. The bonds are secured by a pledge and assignment of the Authority's interests to HSBC, the details of which were not presented to this Court. A pledge and assignment also secure payment of the

principal and interest on the bonds. HSBC holds a lien on the funds it holds, perfected by possession, to secure payment of the bonds under the 1997 Trust Agreement.

Likewise, on April 1, 2001, the Authority issued $34,590,000 in revenue bonds. The 2001 Payment Agreement requires that United make payments of principal and interest on these bonds, and the 2001 Trust Agreement requires U.S. Bank as trustee to reimburse United for construction costs upon its written request. The 2001 Trust Agreement expressly provides that U.S. Bank may rely on a written request as sufficient evidence that United incurred the costs stated, that they are properly payable out of the 2001 construction fund and that there are no liens on the money to be paid. U.S. Bank is to make payments to United "upon receipt" of a written request.

## B. The U.S. Bank Requests

The reimbursement arrangement fell apart in early December of 2002—when United's bankruptcy filing appeared imminent. Prior to December 5, 2002, U.S. Bank had summarily granted each request for construction funds without making any attempt to substantiate it. On December 5, as newspapers across the country reported that United teetered on the brink of bankruptcy, United made a draw request directing U.S. Bank to disburse $1,191,547.29 from the 2001 construction fund as reimbursement for costs incurred on the LAX project. The bankruptcy and district courts referred to these requests as Category III Claims. U.S. Bank took no action on this request, and United filed a voluntary Chapter 11 bankruptcy petition on December 9, 2002. On December 13, 2002, United submitted a request for $233,824.88 to U.S. Bank for costs it had incurred before filing its bankruptcy petition. The lower courts referred to these requests as Category II Claims. U.S. Bank again took no action. United finally incurred $30,093.51 in LAX

construction costs after filing for bankruptcy. The lower courts called claims based on these costs Category I Claims. United however, never submitted a written reimbursement request with respect to these costs. Accordingly, the bankruptcy court granted U.S. Bank's motion for summary judgment on the Category I Claims, and United does not contest that ruling here.

When United entered bankruptcy, it defaulted on its obligations under the 1997 and 2001 Trust and Payment Agreements, which expressly provide that a bankruptcy filing is a default. United, as part of its bankruptcy proceeding, also ceased paying the principal and interest on the bonds, which constitutes further default. United has not made a required payment since October 2002.

The bankruptcy court concluded that, under the terms of the 1997 and 2001 Trust and Payment Agreements, United is obliged to submit a written reimbursement request before the trustee has any payment obligation whatsoever. That court reasoned that, because submitting a proper written request is a condition precedent to obtaining reimbursement, United's claim to the Category I funds must fail. Likewise, the court concluded that the Category II Claims were subject to setoff. Since United was in bankruptcy when it filed the request, the airline was in bankruptcy when it became entitled to the funds. As such, the funds were subject to setoff under 11 U.S.C. § 553(a), which permits setoff if a creditor's claim against the estate and the estate's claim against the creditor both arose before the filing of the debtor's bankruptcy case. The bankruptcy court also concluded that § 553(a)'s mutuality requirement was satisfied because United was obliged to pay the trustee and the trustee was obliged to pay United. Because the Category II Claims fit § 553(a), the bankruptcy court reduced United's obligation to U.S. Bank by the amount United claimed.

The Category III Claims presented the most difficult question for the bankruptcy court. United argued that U.S. Bank had a nondiscretionary duty to disburse the funds for the Category III Claims upon its submission of the written request. U.S. Bank responded that it was not obliged to pay or, in the alternative, that the funds were subject to setoff since U.S. Bank was provided a reasonable time to verify the request. In the circumstance before us, a "reasonable" time carried the transaction into the United bankruptcy, occasioning a default. The bankruptcy court, however, concluded that since no agreement imposes any duty on the trustee to confirm the validity of the submission nor extends to the trustee the discretion to do so, United's right to reimbursement arose upon its submission of the written request.

After concluding that United was entitled to the funds covered by the Category III Claims when it made the request on December 5, 2002, the bankruptcy court moved on to the very difficult issue of assessing damages. The essential problem here, the bankruptcy court explained, is that if it simply awarded damages at law to United, that money would now be subject to setoff. To avoid this problem, the bankruptcy court turned to equity. More specifically, the bankruptcy court applied the equitable maxim codified at California Civil Code § 3529, holding "[t]hat which ought to have been done is to be regarded as done, in favor of him to whom, and against him from whom, performance is due." The bankruptcy court reasoned that since U.S. Bank ought to have paid United on December 5, 2002—before United's bankruptcy filing— U.S. Bank must now pay United and that payment was to be regarded as paid on December 5. Since the court deemed the payment made before United filed for bankruptcy, it likewise concluded that the money was free from setoff.

On appeal, the district court affirmed the bankruptcy court and essentially adopted its reasoning.

## C. The HSBC Matter

The situation with HSBC is slightly different, although United is in default on the HSBC bonds as well. As of December 9, 2002, Chase (HSBC's predecessor) had no outstanding requisitions due from United. On August 13, 2003, HSBC filed a precautionary motion for relief from the automatic stay so that it could apply setoff to United's outstanding obligations and disburse the remaining money in the construction funds—about $37 million—to the bondholders. United consented to the release of all but approximately $5 million. The retained $5 million represents the amount that United contends it incurred in construction costs both before and after it filed for bankruptcy. United submitted a written reimbursement request for these costs to HSBC on September 30, 2004. The bankruptcy court entered an order allowing HSBC to offset and disburse the uncontested $32 million. HSBC voluntarily withdrew without prejudice its precautionary motion as it applied to the retained $5 million.

On February 5, 2004, HSBC filed its second motion for relief from the automatic stay. In this motion, HSBC sought the release of the retained $5 million so that it could apply setoff and disburse these funds to the bondholders. After the bankruptcy court issued its opinion in the U.S. Bank proceedings, United and HSBC agreed that the reasoning of that opinion required this motion to be granted. On October 15, 2004, United and HSBC agreed to the entry of an order granting HSBC's motion. United appealed. Since HSBC and United agreed that the bankrupcty's court's setoff reasoning in the U.S. Bank matter required that the remaining $5 million be offset as well, the district court affirmed the bankruptcy court's order granting HSBC's motion to lift the automatic stay.

## II.  Discussion

## A.  U.S. Bank Matter

We review a bankruptcy court's disposition of cross-motions for summary judgment de novo, with all facts and inferences viewed in a light most favorable to the respective nonmoving parties. *Hoseman v. Weinschneider*, 322 F.3d 468, 473 (7th Cir. 2003). An award of summary judgment is proper when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." FED. R. CIV P. 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). U.S. Bank asserts that the bankruptcy and district courts erred in concluding that it had a nondiscretionary duty to make disbursements to United from the construction fund upon United's request. U.S. Bank further contends that even if such an obligation did exist, any obligation to perform such a duty would be contingent upon United's repayments of interest and principal. U.S. Bank also contends that regardless, the bankruptcy court erred in applying an equitable maxim codified in California law to a contractual breach, and, finally, that its perfected security interest in the construction funds survived because it maintained possession.

A critical question in this case is how the underlying agreements bind the parties to one another. While it is true, as U.S. Bank points out, that separate agreements govern, the reality is that the agreements form the basis of a single relationship: the reimbursement arrangement underlying the financing of the LAX terminal. The structure of the relationship is such that one agreement cannot be understood in isolation from its counterpart. California law instructs that, in circumstances such as these, interrelated documents should be read together for purposes of interpretation. CAL. CIVIL CODE § 1642 (2005) ("Several contracts relating to the same matter, between the same parties, and

made as parts of substantially the same transaction, are to be taken together."); *Versaci v. Superior Court*, 26 Cal Rptr. 3d 92, 97-98 (Ct. App. 2005); *Heston v. Farmers Ins. Group*, 206 Cal. Rptr. 585, 594 (Ct. App. 1984).

This discussion leads directly into the important question of duty—what duty, if any, does U.S. Bank owe to United? U.S. Bank contends that it owes United no duty because their two signatures never appeared on the same document. By the terms of the 2001 Trust Agreement, U.S. Bank reasons, the only duty it owes anyone is the fiduciary duty it owes the bondholders. Again, however, these arguments are flawed in that they misapprehend the essentially unified nature of the Trust and Bond Agreements. The parties understood from the beginning that United would receive the bond money upon its request. These contracts, then, were made for United's benefit, as well as that of the bondholders. It is well settled under California law that when a contract is made expressly for the benefit of another, that other party is a third-party beneficiary. *E.g.*, *Johnson v. Superior Court*, 95 Cal Rptr. 2d 864, 873 (Ct. App. 2000); *Principal Mut. Life Ins. Co. v. Vars, Pave, McCord & Freedman*, 77 Cal. Rptr. 2d 479, 488-89 (Ct. App. 1998); *Harper v. Wausau Ins. Co.*, 66 Cal. Rptr. 2d 64, 68 (Ct. App. 1997); *COAC, Inc. v. Kennedy Eng'rs*, 136 Cal. Rptr. 890, 892 (Ct. App. 1977). Because United is a third-party beneficiary, U.S. Bank owes United the duty of good faith and fair dealing. *E.g.*, *Walker v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 639 (Cal. 1995); *CalFarm Ins. Co. v. Krusiewicz*, 31 Cal. Rptr. 3d 619, 628 (Ct. App. 2005).[1]

---

[1] U.S. Bank's argument is curious on the point of duty. The fulcrum of its overall argument is that equity is inappropriate because this case is contractual. But on the issue of duty, U.S. Bank turns to the *Restatement (Third) of Trusts* to conclude that

(continued...)

What we have, then, are competing obligations of duty on the part of U.S. Bank; U.S. Bank owes the bondholders a fiduciary duty and United the duty of good faith and fair dealing. It is inevitable, especially in a situation such as this one, that these duties will sometimes conflict. The question then becomes how to resolve the conflicts in a manner fairest to the parties and to the terms of the agreements.

It is possible, of course, to conclude that one duty trumps the other.[2] U.S. Bank makes essentially this point, arguing that its fiduciary duty to the bondholders prevented it from paying out to a financially strapped United. But this resolution is rather arbitrary, and it is strange to contend that one's fiduciary duty to a party requires it to violate the terms of the agreement creating that fiduciary relationship. We suppose it is possible to create such an arrangement, but that certainly is not the case here. Moreover, this argument places the burden following resolution squarely on one of the parties to whom a duty is owed, which seems inappropriate. The better resolution, we think, is to balance the duties. Balancing is both more sensible and more just, and it remains truer to the agreement among all interested parties. Thus, we conclude that while U.S. Bank's fiduciary duty to the bondholders is important and must be considered, it does not erase United's claim to duty as a third-party beneficiary.

---

[1] (...continued)
"a person who merely benefits from the performance of a trust is not a beneficiary." While that may be true, United remains a third-party beneficiary under California contract law.

[2] The dissent appears to assert that the fiduciary duty must prevail under the particular circumstances here, but without citing any authority for this conclusion. The fiduciary relationship to the bondholders is the product of the same contract that creates the duty to United.

Since U.S. Bank owes United the duty of good faith and fair dealing, it must face the elephant in the room: United's bankruptcy, which was imminent in December 2002 and of which U.S. Bank rather implausibly denied anticipation at oral argument. There, U.S. Bank asserted that it had no idea United was nearing bankruptcy in December 2002. A cursory glance at the major newspapers of the day makes it hard to believe that even laypersons were unaware of the airline's impending bankruptcy.[3] Surely a major bank in a

---

[3] *E.g.*, Edmund L. Andrews, *No Help for United*, N.Y. TIMES, Dec. 8, 2002, §, at 1 ("The Bush administration refused to give United Airlines . . . a $1.8 billion loan guarantee, almost certainly pushing it to bankruptcy court."); Greg Griffin, *United Board Weighs Filing; Bankruptcy Move Could Come Today*, DENVER POST, Dec. 8, 2002, at A-1 ("United Airlines' board of directors met by teleconference Saturday afternoon to consider how to proceed with a bankruptcy filing in the next two days."); Matthew Brelis, *US Rebuffs United Airlines on $1.8B Loan Guarantees; Bankruptcy Filing Looks Likely*, BOSTON GLOBE, Dec. 5, 2002, at A1 ("United Airlines . . . will almost certainly be forced to file for bankruptcy protection after the federal Air Transportation Stabilization Board yesterday evening rejected its application for $1.8 billion in federal loan guarantees."); Greg Burns, *Bitter Bankruptcy Feared, Workers, Travelers Would Lose, Rivals Stand to Gain*, CHI. TRIB., Dec. 5, 2002, at 1 ("United is running out of options besides bankruptcy"); Editorial, *United: An End, and a Beginning*, CHI. TRIB., Dec. 5, 2002, at 28 ("Given the overwhelming liabilities United faces and the fact that it is burning through cash at a startling rate, the [$1.8 billion loan guarantee] decision almost certainly means the financially struggling airline will be forced to reorganize under bankruptcy protection."); Simon English, *United Airlines on Brink of Collapse*, DAILY TELEGRAPH (London), Dec. 5, 2002, at 34 ("United warned earlier this week that it was down to its last $1 billion and repeated its threat that bankruptcy looked hard to avoid, even with a loan."); *What United's Up Against*, CHI. TRIB., Dec. 4, 2002, at 6 ("But many

(continued...)

lending relationship with United understood the airline's dire financial situation, especially a bank that has in this

---

[3] (...continued)
airline analysts say bankruptcy is inevitable."); Keith L. Alexander, *Frequent Fliers Look Ahead to United Filing*, WASH. POST, at E01; James Flanigan, *United is a Poor Model for Employee Ownership*, L.A. TIMES, Dec. 4, 2002, at 3:1 ("It would be easy to look at what's happening at United Airlines, now on the brink of bankruptcy, and conclude that the concept of employee ownership in America has fallen into a tailspin."); Russell Grantham, *Delta's Status Better than United, Observers Say*, ATLANTA J.-CONST., Dec. 4, 2002, at 1D ("United will almost certainly seek Chapter 11 protection from creditors, said [an analyst], if Machinists union members don't approve an amended $700 million concession package this week."); Greg Griffin, *United, Union Set New Vote; Airline Defers Bond Payment, Though Another Comes Due in Solvency Fight*, DENVER POST, Dec. 3, 2002, at A-01 ("Without ratification of the 7 percent pay cut by the mechanics, cash-strapped United could file for bankruptcy immediately because it will have no chance of receiving a loan guarantee from the government. . . . United also is preparing for the possibility of Chapter 11, trying to line up $1.5 billion in emergency financing to fund its operations while in court, according to published reports."); John Schmeltzer, CHI. TRIB., Dec. 3, 2002, at N1 ("Hedging its bets, United also is working with private lenders to finance the company's operations should it file for court protection. 'You don't arrange bankruptcy financing unless you think you're going to file for bankruptcy,' [an analyst] said. 'If they don't file, I would be surprised.' "); *Air NZ Unfazed As United Teeters on the Edge of Bankruptcy*, N.Z. HERALD, Dec. 2, 2002 ("United is likely to file for bankruptcy within the next two weeks unless it can soon get a new wage-cut deal from reluctant mechanics and a crucial federal guarantee of a US$1.8 billion . . . loan, sources familiar with the matter said."); John Schmeltzer, *United, Mechanics Return to the Table; Flight Attendants OK Wage Cuts*, CHI. TRIB., Dec. 1, 2002, at C1 ("United doesn't have much more time before a bankruptcy filing will be its only alternative.").

case repeatedly asserted the need for due diligence.[4] This understanding implicates critically important policy questions: is it appropriate to imbue trustees with virtually unfettered discretion to disburse funds so that they can punish debtors on the verge of bankruptcy? Should we extend such a power even in the face of agreements that plainly create a nondiscretionary duty to disburse funds? We think not.

Our answer may have been different in a factual setting with different underlying agreements. But the reality here is that the parties negotiated agreements that afford U.S. Bank no discretion in disbursing the funds. Under California law, a trustee's duties and obligations are strictly defined by and limited to the terms of the underlying agreement, particularly in relationships involving indenture trustees. *Bryson v. Bryson*, 216 P. 391, 393 (Cal. Dist. Ct. App. 1923). The agreements here provide that once United completes the work and once United submits a reimbursement request, U.S. Bank must pay. (2001 Payment Agreement § 3.3(a) ("Each of the payments referred to . . . shall be made upon receipt by the Trustee of a Written Request of the Corporation.").) Moreover, the Agreements exclude the need for due diligence by stating that written requests conforming to certain procedures "shall be sufficient evidence" that the items are properly reimbursable. Reading a "reasonable time to perform due diligence" clause into the agreements ignores their plain text and the course of

---

[4] U.S. Bank's denial is rendered all the more implausible by its assertion in its opening brief to this Court that "[w]ithholding reimbursements to United when it is expected that United will not honor its contractual obligations under the [2001] Payment Agreement was simply an action U.S. Bank deemed necessary with respect to enforcing United's obligations under the Payment Agreement." (Pet'r Br. at 15-16) (footnote omitted.) The agreements do not afford U.S. Bank this discretion.

dealing between the parties. Thus, we conclude, as did the bankruptcy and district courts, that U.S. Bank had a nondiscretionary duty to disburse funds upon an appropriate request from United.

These conclusions permit us to resolve the first step in adjudicating these claims: who is entitled to the money in absence of setoff (an issue to which we will return)? Since the terms of the agreements clearly state that once a request is properly filed, U.S. Bank must reimburse, it follows that United was entitled to the funds covered by the Category III Claims on December 5, 2002, and the funds subject to the Category II Claims on December 13, 2002.

Under California law as preserved in the Bankruptcy Code, mutual debts arising before the commencement of a bankruptcy proceeding may be offset, subject to certain exceptions not relevant here. "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the 'absurdity of making A pay B when B owes A.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank of Boston*, 229 U.S. 523, 528 (1913)). Section 553(a) "generally permit[s] a creditor to offset, on a dollar-for-dollar basis, a debt it owes to the bankrupt party on a pre-commencement debt that the bankrupt owed to the creditor." *United States v. Maxwell*, 157 F.3d 1099, 1100 (7th Cir. 1998); *see also* CAL CIV. PRO. CODE § 431.70 (2005); *Harrison v. Adams*, 128 P.2d 9, 11 (Cal. 1942); *Plut v. Fireman's Fund Ins. Co.*, 102 Cal. Rptr. 2d 36, 42 (Ct. App. 2000).

Setoff is appropriate against the Category II Claims because, under the 2001 Agreements, United owed U.S. Bank and the bondholders repayments of principal and interest. Once United entered bankruptcy, all debts were therefore subject to setoff. United's primary defense against setoff is that the debts are not mutual. California law and

§ 553(a) require that, for setoff to apply, debts be between the same parties and that both arise before the filing of the bankruptcy petition. *Meyer Med. Physicians Group, Ltd. v. Health Care Serv. Corp.*, 385 F.3d 1039, 1041 (7th Cir. 2004); *In re Doctors Hosp. of Hyde Park, Inc.*, 337 F.3d 951, 955 (7th Cir. 2003); *Harrison*, 128 P.2d at 11-12. United argues that since, as we have concluded, U.S. Bank's obligation to pay does not arise until United submits a request, U.S. Bank's debt to United is not prepetition and therefore enjoys no mutuality with United's debt to repay principal and interest.

In order for this argument by United to succeed, we would need to read each reimbursement request as a separate act that obligates U.S. Bank. That is, we would need to conclude that U.S. Bank is bound to pay only after United submits a reimbursement request, and once that request has been paid out, U.S. Bank's obligation ceases. But that is not the arrangement here. Although United was not *entitled* to this money until it filed its request, U.S. Bank bound itself to pay, subject to request, when it entered the agreements in 2001. We have already explained that we are not willing to view the arrangement as a series of piecemeal agreements; it is improper to view the 2001 Trust Agreement and the 2001 Payment Agreement as two separate agreements because together they form a single framework of provisions governing the financing arrangement, and it not possible to understand one without reference to the other. Likewise, it is improper to treat each interaction in this arrangement as a separate transaction. Accordingly, this debt arose prepetition.

Moreover, these funds are not, as United contends, special purpose funds exempt from setoff. *See In re Ben Franklin Retail Store, Inc.*, 202 B.R. 955, 957 (Bankr. N.D. Ill. 1996). This exemption applies when a debtor deposits funds for some special purpose, which are thereby held in trust for the debtor. *Id.* A typical example of a special purpose fund

is collateral pledged to satisfy obligations to third parties in the event of a draw on a letter of credit. *Id.* Here, however, the bondholders deposited the funds—not United. These funds are not earmarked in any way that imposes a special purpose on them, nor are they pledged for any third-party purpose (that is, some purpose outside the LAX project). Thus, these debts are mutual, ordinary purpose funds subject to setoff.

We next confront the issue of default. Section 6.1(c) of the 2001 Payment Agreement identifies filing a bankruptcy petition as an event of default.[5] United argues that this provision is an ipso facto default term, which 11 U.S.C. §§ 363(1), 365(e)(1), and 541(c)(1)(B) prohibit. United reasons that the default provision of the 2001 Payment Agreement provide U.S. Bank with its only avenue to setoff, which means that the default provision modifies United's interest in property. Authority supporting this proposition is slim and not quite on point. Indeed, the only case directly on point brought to our attention—an unpublished disposition at that—limits its holding to situations where debtors are not otherwise in default. *Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, 1993 WL 159969, at *5 (S.D.N.Y. May 10, 1993).

United, on the other hand, is in default for reasons extending beyond the bankruptcy filing; the airline has not made a required payment of principal and interest since October 2002. Even if we were to determine that the ipso facto default provisions are unenforceable, United's nonpayment remains a default under Section 6.1 of the 2001 Payment Agreement (which is parallel to Section 7.01 of the 2001 Trust Agreement). United contends that these nonpayments ought not count as defaults, because the

---

[5] Nothing, however, indicates that *anticipation* of bankruptcy is cause to withhold payment.

Bankruptcy Code prohibits these types of payments while it remains in bankruptcy. The Code may well prohibit such payments, but the agreements—the sole authority governing this relationship—provide no basis to avoid setoff on this ground. United must be held to the deal it made, just as U.S. Bank must be held to the payment obligations it made.

In addition, United's ipso facto argument is not particularly relevant here. Section 553(a) expressly preserves creditors' setoff rights that are protected under state law. California law expressly extends setoff rights to bankruptcy filings in situations where the creditor and the debtor share a mutual debt. Thus, because the Category II Claims satisfy the requirements for setoff as outlined in California law and preserved in § 553(a), the claims are subject to setoff.

Now, having resolved the Category II Claims and explored some aspects of setoff, we can move on to the Category III Claims. As we have demonstrated, United was entitled to the claimed funds upon making its reimbursement request—that is, on December 5, 2002. Because U.S. Bank had a nondiscretionary duty to reimburse, it wrongfully withheld these funds. In the absence of bankruptcy, we could simply order U.S. Bank to pay United now and the issue of damages would be resolved. But the bankruptcy filing, which United is only just now overcoming, complicates the matter. For if we were simply to award United its damages effective today, the money would be subject to the bankruptcy filing and would be disbursable to creditors. The purpose of damages would not be served; United would not be compensated for the damages it suffered, nor would the construction funds be available for their intended purpose. *See, e.g.*, *Avery v. Fredericksen & Westbrook*, 154 P.2d 41, 42 (Cal. Dist. Ct. App. 1944); *Mente & Co. v. Fresno Compress & Warehouse Co.*, 298 P. 126, 128 (Cal. Dist. Ct. App. 1931). In addition, U.S. Bank would be rewarded for speculating on United's bankruptcy, which surely would

increase the incidence of such behavior in the future. The question, then, is whether California law contains a remedy that will make United whole.

The bankruptcy court, as we have discussed, believed that equity provided the necessary remedy. While the maxim—that which ought to be done is deemed as having been done—is codified under California law and certainly makes sense, it may seem to be a tight fit here. First, equity is generally unavailable in breach of contract cases, although the courts are willing to turn to equity where damages at law are inadequate. *Wilkison v. Wiederkehr*, 124 Cal. Rptr. 2d 631, 638 (Ct. App. 2002). Second, and perhaps more fundamentally, applying the maxim in this context may appear to be reaching beyond the bounds of this case to force a result.

That appearance, however, is deceptive. The California courts, like courts of other jurisdictions, rely on a number of equitable doctrines in different situations to provide the relief required to redress a plaintiff's injuries when the law is unable to do so. *See, e.g.*, *Cortez v. Purolator Air Filtration Prods. Co.*, 999 P.2d 706, 716-17 (Cal. 2000); *Poultry Producers of Cent. Cal., Inc. v. Nilsson*, 197 Cal. 245, 253-55 (Cal. 1925); *Portuguese Am. Bank v. Schultz*, 193 P. 806, 807 (Cal. Dist. Ct. App. 1920). One doctrine rooted in equity with particular analogic value here is the doctrine of constructive receipt.

The doctrine of constructive receipt—an income tax doctrine—has the same basic thrust as the equitable maxim that the bankruptcy court relied upon.[6] The constructive

---

[6] Despite the dissent's suggestions to the contrary, we do not directly rely on the doctrine of constructive receipt to decide this case. The doctrine only represents an apt analogy; it, like this case, directs that context and timing are relevant even in

(continued...)

receipt doctrine provides that cash and receipts in kind are reportable as income either when they are actually received or when they are constructively received. Income is constructively received when, although a taxpayer has the power to receive income, she chooses not to do so—generally to obtain favorable tax treatment. *E.g.*, *Corliss v. Bowers*, 281 U.S. 376, 376-77 (1930); *Hornung v. Comm'r*, 47 T.C. 428, 433-34 (1967). The constructive receipt doctrine, then, addresses issues of timing, specifically to preclude taxpayers from manipulating the timing of income receipt for their own benefit. In the case before us, the problem is to preclude the lender from manipulating the timing of payment to the detriment of the borrower.

Quite clearly, then, the policy underlying the constructive receipt doctrine is appropriately responsive to the issues in this case. A key policy issue here is that a trustee should not be rewarded for speculating on the bankruptcy of a debtor. But the legal redress for such an injury is insufficient. The common thread between this case and ordinary applications of the constructive receipt doctrine is the idea that parties in a position to control disbursements may not manipulate the system to avoid the consequences of controlling requirements (e.g., the Internal Revenue Code or the Trust Agreements). U.S. Bank withheld reimbursement, predicting—accurately, it turned out—that United would enter bankruptcy. It is as improper for U.S. Bank to withhold the Category III Claims to obtain a financial advantage as it is for a taxpayer to defer the receipt of

---

[6] (...continued)

cases involving comprehensive codes. *See also In re Payne*, 431 F.3d 1055, 1057-58 (7th Cir. 2005) (Posner, J.) (holding that the definition of an income tax "return" in both the Bankruptcy Code and the Internal Revenue Code depends, in part, on context). Contrary to the dissent, nothing precludes appellate courts from seeking apt analogies, whether or not suggested by the parties.

income to avoid a realization event to reduce taxes.[7] The California courts are willing to apply extralegal remedies in situations where the equities demand it. *E.g.*, *Cortez*, 999 P.2d at 716-17 (applying equitable considerations to a disposition under unfair competition law); *Poultry Producers of Cent. Cal., Inc.*, 197 Cal. at 255-56 (awarding specific performance and damages for breach of contract); *see also Hirshfield v. Schwartz*, 110 Cal. Rptr. 2d 861, 876 (Ct. App. 2001) ("'Equity or chancery law has its origin in the necessity for exceptions to the application of rules of law in those cases where the law, by reason of its universality, would create injustice in the affairs of men.'" (quoting *Estate of Lankershim*, 58 P.2d 1282, 1284 (Cal. 1936)). In this case, application of an equitable remedy is appropriate to ensure that the parties are made whole for the breach. And, under the particular circumstances present here, U.S. Bank's fiduciary duty to the bondholders does not, as we have earlier noted, extinguish its contractual obligation of good faith and fair dealing with respect to United. U.S. Bank may not breach its agreements in a purported effort to observe its fiduciary duty.

Finally, U.S. Bank's point about holding a perfected security interest fails because as of December 5, 2002, the effective date of this transfer, no debt existed that such an interest might secure. United was current in its payments, and nothing had occurred to trigger application of the security interest. Accordingly, United is entitled to the full amount of the Category III Claims free from setoff.

---

[7] U.S. Bank argues that its delay was not to procure advantage but instead to conduct due diligence. The terms of the agreements and the course of dealing expose this argument as merely a post hoc rationalization. In any event, whether or not U.S. Bank improperly withheld payment in anticipation of bankruptcy here, the dissent would provide an incentive for lenders in these circumstances to do so in the future.

U.S. Bank argues that the decisions below will wreak havoc with commercial law. It believes that the bankruptcy and district courts have so blurred the lines drawn in the Bankruptcy Code as to render the Code unworkable. It argues that our affirmance would undermine well-established principles of both bankruptcy and general commercial law.

Those doomsday fears, however, are overstated. We have done nothing to blur the operation of the Bankruptcy Code. Our decision today stands for the simple propositions that parties will be held to their deals and that one party may not manipulate the timing of its payments to exploit the vulnerabilities of the other. U.S. Bank's characterization of recourse to equity as some rogue remedy is baseless. Courts consistently rely on equitable remedies where damages at law are insufficient. More fundamentally, this type of remedy is appropriate and applicable in cases where one party shirks its obligations in order to obtain benefits at the expense of the other.

Moreover, if any position is likely to upend well-settled law, it is U.S. Bank's position. Despite its assertions to the contrary at oral argument, U.S. Bank conceded in briefing that it deemed it necessary to withhold payment to United because U.S. Bank believed United was nearing bankruptcy. This type of speculation is not permitted by the agreement the parties made, which once again directs that when United incurs expenses and properly requests reimbursement, U.S. Bank must pay and promptly. Sanctioning that speculation here would create incentives for future lenders to withhold funds when it appears that their borrowers are in financial trouble, regardless of their bargain.

## B.  HSBC Matter

The final matter before the Court is HSBC's motion for relief from the automatic stay. The relief requested would

allow HSBC to distribute approximately $5 million in retained funds to bondholders. We review a bankruptcy court's decision to grant relief from an automatic stay for an abuse of discretion. *Meyer Med. Physicians Group, Ltd.*, 385 F.3d at 1041. HSBC argues that because United submitted its written reimbursement request after it filed for bankruptcy (on September 30, 2004), those funds are subject to setoff. Accordingly, HSBC argues that the bankruptcy court properly granted its motion to lift the automatic stay and the district court properly affirmed.

HSBC and United have stipulated that their respective claims succeed or fail with the setoff issue. United submitted the reimbursement request at issue here postpetition for work it completed prepetition. United has no colorable claim that it was entitled to this money before entering bankruptcy. As we have determined that reimbursement requests submitted after bankruptcy are subject to setoff, we conclude that the HSBC motion was properly granted. Moreover, since we conclude that HSBC has setoff rights, we find it unnecessary to address HSBC's recoupment argument. Thus, we affirm the Bankruptcy Court and District Court orders granting relief from the automatic stay.

## III. Conclusion

In sum, we AFFIRM the bankruptcy court and the district court in full. We direct that U.S. Bank turn over the Category III funds, which United requested on December 5, 2002. The Category II funds, which United requested on December 13, 2002, are subject to setoff. Finally, we AFFIRM the order granting HSBC's motion for relief from the automatic stay.

SYKES, *Circuit Judge,* concurring in part, dissenting in part. I agree that summary judgment was properly granted to U.S. Bank on the issue of United's postpetition reimbursement request for prepetition construction expenses (the so-called "Category II" claims). Under the 2001 trust and payment agreements, U.S. Bank's obligation to pay United's construction reimbursement claims and United's obligation to pay principal and interest on the construction bonds are mutual debts subject to setoff under 11 U.S.C. § 553(a). I also agree that summary judgment was properly granted to HSBC Bank under the terms of the 1997 trust and payment agreements, as the same setoff analysis controls.

I cannot agree, however, that United's prepetition reimbursement request (the so-called "Category III" claims) should be treated differently. Neither the taxation doctrine of "constructive receipt" invoked by the majority here nor the California equitable maxim invoked by the bankruptcy court below is applicable. U.S. Bank's nonpayment of United's prepetition reimbursement request gives rise to a *legal* claim for breach of the trust and payment agreements, not an *equitable* claim for antecedent possession of money in the construction fund. As such, the claim is subject to setoff under § 553(a) because of the same mutuality in the parties' indebtedness under the 2001 agreements. *See Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995). Under the terms of those agreements, U.S. Bank owes United nearly $1.2 million on the Category III claims, which should be offset against the $34 million debt United owes on the underlying bonds, reducing it. But there is no justification for treating $1.2 million of the construction fund as the property of United's bankruptcy estate, subject to turnover and not setoff. I would reverse the summary judgment in favor of United on the Category III claims.

Although the construction fund is held in trust, U.S. Bank's obligations to United are wholly contractual, not

fiduciary. United is not a party to the trust agreement and U.S. Bank is not a party to the payment agreement. The California development Authority and U.S. Bank, as trustee, are parties to the trust agreement; the Authority and United are parties to the payment agreement. The majority is correct that under California law the contracts are interrelated and must be read together, but that does not mean that U.S. Bank owes any fiduciary duty to United or that equity controls the parties' substantive rights or the applicable remedies.

Under the terms of the trust agreement, U.S. Bank's fiduciary obligations as trustee are to *the bondholders only*; the proceeds of the bond issue were deposited in the construction fund, pledged to repayment of principal and interest, and "held in trust for the benefit of the bondholders." The pledge "constitute[s] a first and exclusive lien" held by U.S. Bank as trustee on the amounts in the construction fund "for the payment of the Bonds in accordance with the terms" of the trust and payment agreements.

Under the terms of the payment agreement, United agreed to pay principal and interest on the underlying bonds and the Authority agreed that proceeds in the construction fund would be made available to United "for the purpose of paying for Costs of the LAX Project." Correspondingly, the trust agreement specifies that proceeds in the construction fund shall be made available to reimburse construction costs "upon the condition that [United] make payment" on the bonds. U.S. Bank as trustee is authorized to "take such actions as the Trustee deems necessary to enforce [United's] obligation under the Payment Agreement to make timely payment of the principal of and interest on the Bonds."

The payment agreement provides that payment of reimbursement claims "shall be made upon receipt by the Trustee of a Written Request" from United. The trust

agreement provides that "[e]ach Written Request of [United] shall state, and shall be sufficient evidence to the Trustee . . . that obligations in the stated amounts have been incurred by [United] and that each item thereof is a proper charge against the Construction Fund in accordance herewith."

As between U.S. Bank and United, these terms establish only contractual—not fiduciary—rights and duties. State law governs the determination of the nature and scope of the property interests that comprise the "property of the estate" in bankruptcy, *see* 11 U.S.C. § 541(a)(1), as well as the setoff rights that are preserved under § 553(a) of the Bankruptcy Code. *See Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law"); *Strumpf*, 516 U.S. at 18 ("[Section] 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists [under state law] is preserved in bankruptcy."). In California (as in other states) law—not equity—provides the usual remedy for breach of contract. *Wilkison v. Wiederkehr*, 124 Cal. Rptr. 2d 631, 638 (Cal. Ct. App. 2002). "[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988); *see also United States v. Noland*, 517 U.S. 535, 539, 543 (1996). "There is no general equitable override to the Bankruptcy Code." *In re Payne,* 431 F.3d 1055, 1062-63 (7th Cir. 2006) (Easterbrook, J., dissenting).

The bankruptcy court held (and the district court agreed) that United's prepetition (Category III) reimbursement claim was due and payable when U.S. Bank received a written request in the form specified by the agreements. U.S. Bank received United's $1.2 million reimbursement request on December 5, 2002—four calendar days but only two business days before United's bankruptcy filing—and

it was in proper form. U.S. Bank had a contractual duty to pay United's claim "upon receipt," and its nonpayment is actionable as a breach of the trust and payment agreements. That claim is property of the bankruptcy estate. Instead of classifying it as one at law for damages for breach of contract, however, the bankruptcy court invoked an equity maxim codified at section 3529 of the California Civil Code—"[t]hat which ought to have been done is to be regarded as done"—and treated the funds as having been transferred to United prior to the bankruptcy filing. The court further held (on the strength of this equitable maxim) that this "implied" transfer had the effect of terminating U.S. Bank's security interest because a security interest in money is perfected by possession and under California law continues only while the secured party retains possession. *See* CAL. COM. CODE § 9313(d). Thus, the court concluded, U.S. Bank was holding property that belonged free and clear to United's bankruptcy estate, and $1.2 million of the construction fund was subject to turnover and not setoff.

This approach was unwarranted. It ignores the fact that the construction fund is held in trust for the benefit of the bondholders, not United. Equity should not be invoked to enlarge United's contractual rights at the expense of the bondholders' fiduciary interests. It also conflicts with California law, under which the nonpayment of the reimbursement claim is actionable as a legal claim for breach of contract, foreclosing application of equitable remedies. "'Equity follows the law and, when the law determines the rights of the respective parties, a court of equity is without power to decree relief which the law denies.'" *Wilkison*, 124 Cal. Rptr. 2d at 638 (quoting *Shive v. Barrow*, 88 Cal. App. 2d 838, 843-44, 199 P.2d 693 (1948) (citing *Morrison v. Land*, 169 Cal. 580, 586, 147 P. 259 (1915))). When the remedy at law is adequate, equity will not step in to rescue a claimant from other circumstances—particularly circumstances of his own making. *See, e.g.*, *Wilkison*, 124 Cal.

Rptr. 2d at 640-41 ("[I]f the plaintiff's cause of action is one for which the legal remedy of damages is generally deemed adequate, it does not become inadequate and justify a decree of specific performance merely because the legal remedy has been lost through neglect." (quoting 5 B.E. WITKIN, CAL. PROCEDURE, Pleading, § 759, at 215 (4th ed. 1997))).

That United's breach of contract damages claim is subject to setoff against its own much larger debt under the 2001 agreements does not mean the legal remedy is inadequate; resort to equity is not justified as a means of avoiding the effects of otherwise applicable law that defines the respective rights and duties of the parties. *Id.*; *see also Buntrock v. S.E.C.*, 347 F.3d 995, 997, 999 (7th Cir. 2003) ("The victim of a breach of contract could not defend his request for injunctive relief by arguing that his suit for damages would be barred by the statute of limitations."). Outside bankruptcy United would not be entitled to an "implied equitable transfer" merely because its breach of contract damages are legally offset by its own larger debt to U.S. Bank. The analysis should be no different inside bankruptcy.

The majority apparently views the bankruptcy court's use of the California equity maxim with skepticism but strains to find another that will produce the same result. It locates one in the domain of income tax law: the doctrine of "constructive receipt," whereby income is deemed received and reportable to the Internal Revenue Service when it is actually *or* constructively received, the latter occurring when the taxpayer has the power to receive income but chooses not to, usually for tax avoidance purposes. *See supra* p. 19. No one raised this doctrine, either below or on appeal. We should generally refrain from deciding nonjurisdictional issues on grounds not asserted by the parties, *see United States v. Nash*, 29 F.3d 1195, 1202, n.5 (7th Cir. 1994), not least because it sabotages the ad-

versarial process. *See McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2 (1991) ("What makes a system adversarial rather than inquisitorial is . . . the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties."). Parties in court have the right to address the arguments made by their opponents and rely on the doctrine of waiver for arguments not made. Moreover, decisional grounds invoked sua sponte by an appellate court may lack appropriate factual support and have not been subjected to normal adversarial testing, which could expose weaknesses, or worse, outright error.

The majority believes the doctrine of constructive receipt "is appropriately responsive to the issues in this case" because it "addresses issues of timing, specifically to preclude taxpayers from manipulating the timing of income receipt for their own benefit." *Supra* pp. 19-20. As applied here, according to the majority, the doctrine serves to prevent U.S. Bank from "speculating" on United's bankruptcy by manipulating the timing of its payment on the reimbursement claim. The majority also justifies application of the doctrine as a means of enforcing U.S. Bank's contractual duty of good faith and fair dealing. But there is no evidence of manipulation or bad faith on the part of U.S. Bank and no authority for the importation of this income tax doctrine into a breach of contract dispute.

It is undisputed that U.S. Bank received United's reimbursement request sometime on Thursday, December 5, 2002, and that United filed for bankruptcy before business opened on Monday, December 9, 2002. At most, as I have noted, two business days passed. It is also undisputed that U.S. Bank paid numerous prior reimbursement requests, apparently summarily and promptly, although the record does not address the course of dealing between the parties regarding the mode and timing of these payments. It is

reasonable to infer that U.S. Bank was aware of United's looming bankruptcy in December 2002, for the reasons noted by the majority. But it is quite a leap from that permissible inference to a finding—by an appellate court—of manipulation or bad faith shirking of contractual obligations. Reviewing courts are not in the fact-finding business. In any event, this matter is before us on summary judgment.

Application of the taxation doctrine of constructive receipt is no more supportable than application of the California equity doctrine invoked by the lower courts. Accordingly, I would reverse the summary judgment in favor of United on the issue of the Category III claims and to that extent must respectfully dissent.

A true Copy:

      Teste:

                    _____

                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*